Filed 8/16/22  In re Samantha P. CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re SAMANTHA P., a Person Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>JOSE P.,<br><br>    Defendant and Appellant. | G061260<br><br>(Super. Ct. No. 21DP1153)<br><br>O P I N I O N |

Appeal from orders of the Superior Court of Orange County, Vibhav Mittal, Judge.  Affirmed.

Jill Smith, under appointment by the Court of Appeal, for Defendant and Appellant.

Leon J. Page, County Counsel, Karen L. Christensen and Jeannie Su, Deputy County Counsel, for Plaintiff and Respondent.

No appearance for the Minor.

# INTRODUCTION

Jose P., the father of the minor Samantha P., appeals from the order vesting jurisdiction over Samantha in the juvenile court and the disposition order removing her from his custody. Samantha came to the attention of Orange County Social Services Agency (SSA) when her school reported bruises on her arm. Samantha claimed that Maria B., Jose's wife or live-in girlfriend, had caused the bruising.[1] Jose did not believe Samantha and proffered several alternative theories for how she acquired the bruises.

We affirm the jurisdiction order. We do not reweigh evidence or reassess credibility, and Jose's appeal of this order is, in essence, an attack on both. The bottom line is that the juvenile court believed Samantha when she asserted that Maria had hit her hard enough to cause significant bruising. Consequently, Jose's persistent denials and refusal to believe Samantha meant, in the court's view, that he was not going to protect her from future assaults. There was therefore "a substantial risk that [Samantha] will suffer[] serious physical harm" in Jose's custody. (Welf. & Inst. Code, § 300, subd. (b)(1).)[2]

As for the disposition order, we affirm that as well. Even with the higher standard of proof for removal (§ 361, subd. (c)(1)), the court's order rested on substantial evidence, including Jose's refusal to believe Maria had injured Samantha and the evidence of Samantha's fear of her father. Once again, factual determinations and credibility assessments are for the juvenile court.

---

[1] Maria's status was variously indicated in the record as "wife," "girlfriend," "domestic partner," or "stepmother." For his part, Jose asserted he was not married to anyone.

[2] All further statutory references are to the Welfare and Institutions Code.

**FACTS**

Jose and Samantha's mother, Claudia A., have been engaged in a long-running custody battle over Samantha.[3] At the time of detention, when Samantha was nine years old, each parent had equal custody. The record contains reports of numerous referrals to SSA by one parent against the other, beginning when Samantha was under two years old, all of which were determined to be unfounded or inconclusive.

Jose and Claudia live separately and were apparently never married to each other. Jose and Maria live together with Maria's son. Claudia and her now-husband have two children together. The four children living with Claudia, including Samantha and another daughter, were in a voluntary family services program with SSA as of October 2020. Jose participated in this program as well, for six months. SSA expected to close the program in November 2021.

On September 24, 2021, a Friday, Samantha's school reported to SSA that she had multiple bruises on her left arm. Samantha said Maria had grabbed her and hit her with a belt the night before because she wore dirty shoes in the house. She said she did not want to go back to Jose and Maria's home. She also said she did not tell Jose that Maria had hit her. She waited until the next day and told a friend at school and then her teachers. The record includes photographs of Samantha's bruises, apparently taken at the school.

The school's resource officer initiated the report to SSA as a "law enforcement requested immediate response." He said he had considered filing his own juvenile court petition had SSA not appeared at the school.

---

[3] The dispute appears to have begun when Claudia filed for child support. Jose retaliated by filing for custody, and, according to SSA, "they have been accusing each other [of abusing Samantha] ever since."

When first informed of the allegations of abuse, Jose stated that he would prefer to have Samantha "go home with" the social worker rather than reside with Claudia. He reiterated this sentiment – better foster care than live with her mother – two weeks later.

3

Photos of Samantha's injuries were sent to a child abuse physician, who said that the bruising was consistent with Samantha's report and looked like defensive injuries. It was not consistent with accidental bruising while playing.

Samantha was detained on October 12, 2021, and was released to Claudia under protective orders. Jose was to have a minimum of six hours of monitored visitation per week, not monitored by Maria.

From the very first time he was informed of Samantha's injuries, Jose maintained that she was lying about Maria's causing them. Nothing – even the child abuse physician's conclusions – could convince him that the accusations were anything other than an effort to disparage Maria or a plot by Claudia to get child support. He offered several theories to account for the bruising. One was that Samantha had been injured at Claudia's house and that Claudia had coached Samantha to say Maria had hit her and to wait several days to report the injury.[4] Another theory was that Samantha had injured herself on purpose. Another was that she and Claudia had mutually agreed to injure Samantha themselves and then blame Maria.

The record includes many instances of Jose's focus on himself rather than on Samantha. When a social worker spoke to him about two weeks after the abuse report, he said that the "situation" was harder for him than for anyone else, including Samantha. He told SSA that he wanted Claudia to bring the clothes Samantha had been wearing when she was picked up from school to the detention hearing because he had paid a lot of money for them. He was informed that the clothes belonged to Samantha, not to him.[5]

---

[4] As it happened, a social worker was present in Claudia's home on that day, a Tuesday, because of the voluntary family services program, and she did not see any bruises on Samantha. The social worker also denied any safety concerns about Claudia.

[5] When Samantha asked to have her shoes returned, Jose brought up the school clothes again as a reason to deny the request.

4

Between detention and the jurisdiction/disposition hearing, Samantha was ambivalent about visiting Jose. At times she would agree to visit by video (at first she refused to visit in person), and the visits were, for the most part, without incident. At one later point, she asked why she had not had an in-person visit, when she wanted to have one. When, however, the social worker offered to set one up, Samantha changed her mind and said she did not want to visit and would not say why.

At other times, however, Samantha would adamantly refuse to visit, even by video, and no persuasion by SSA or Claudia would change her mind. The more people pressured her to visit on these occasions, the deeper she dug in her heels. And most of the time she offered no explanation for her refusal to visit or simply said she was not ready.

Jose's response to Samantha's refusal to visit was usually to insist on his rights and to assert that she had no say in the matter. When visitation began, Samantha asked to start with virtual visits, with just the two of them, and suggested that Jose use her room. His response was that no one was going to tell him what to do in his house. His response to Samantha's refusal to have a video visit was to suggest that a social worker pick her up after school for a forced in-person visit. He made this same suggestion when Samantha declined to have an in-person visit with him in November. A request by Samantha to change the visitation days because of her homework was met with his statement that she was "not of age to be making decisions" and that he preferred to keep the days as they were. When Samantha asked to have an in-person visit in the park one weekend, Jose refused because he would have to drive from Riverside to the visit. Weekday visits were more convenient for him, he said, and he again insisted that Samantha had no right to decide whether to visit him. He also threatened to use his educational rights to keep Samantha from participating in an after-school program, apparently just to exercise these rights. He gave no reason for objecting to her participation other than that he had the right to do so.

The jurisdiction/disposition hearing took place over four days in February and March 2022. Both Jose and Samantha testified. Maria also testified and denied hitting Samantha. On March 10, the court sustained the petition under section 300, subdivision (b)(1), failure to protect, and dismissed the allegations of serious emotional damage (§ 300, subd. (c).) It also removed Samantha from Jose's custody under section 361, subdivision (c)(1).

## DISCUSSION

The juvenile court sustained the allegations of the amended petition under section 300, subdivision (b) [failure to protect]. It determined disposition under section 361, subdivision (c)(1), which requires clear and convincing evidence of a threat to a child's safety and no reasonable means of protecting the child other than removal. Jose asserts the court had insufficient evidence upon which to base both orders.

"The standard of review in juvenile dependency cases is the same as in other appeals on grounds of insufficiency of the evidence. We review the record to determine whether there is any substantial evidence, contradicted or not, which supports the court's conclusions." (*In re Kristin H.* (1996) 46 Cal.App.4th 1635, 1649.)

"'The term "substantial evidence" means such relevant evidence as a reasonable mind would accept as adequate to support a conclusion; it is evidence which is reasonable in nature, credible, and of solid value. [Citation.]' [Citation.] 'In making this determination, all conflicts are to be resolved in favor of the prevailing party, and issues of fact and credibility are questions for the trier of fact. [Citation.] In dependency proceedings, a trial court's determination will not be disturbed unless it exceeds the bounds of reason. [Citation.]' [Citation.]" (*In re E.B.* (2010) 184 Cal.App.4th 568, 574-575, overruled on other grounds in *Conservatorship of O.B.* (2020) 9 Cal.5th 989; see also *In re I.J.* (2013) 56 Cal.4th 766, 773.)

Because we cannot see or hear the witnesses, the law puts limits on our review. As a reviewing court we are not allowed to evaluate credibility. That is the

6

function of the juvenile court, and we are bound by the lower court's findings. (See *In re T.W.* (2013) 214 Cal.App.4th 1154, 1161-1162; *In re Heather A.* (1996) 52 Cal.App.4th 183, 193 [issue of credibility for the trial court].)

**I.        Jurisdiction**

Jose makes two arguments with respect to jurisdiction. First, he points to past instances when Samantha lied or made an accusation about Maria after being coached by Claudia. Second, he argues the child abuse physician could not state definitively that the bruises occurred on the night Samantha was in Jose's custody, that is, the night before Samantha reported them to her teachers. In other words, he argues Samantha might have been injured at Claudia's house.

The court took this evidence into account and decided to believe Samantha. As the court pointed out, when Samantha had lied in the past or had been coached to make an accusation about Maria, she always immediately admitted that she had done so. In this instance, however, Samantha's story about who hit her never changed, even while she was testifying in court under the judge's eye.

As for the physician's opinion, he originally stated he could not rule out that the injury occurred while Samantha was last at Claudia's, that is, on the Tuesday before the Friday when she reported the abuse. Then he looked at the photos again and opined it was "'a little too far' back" for the bruising to have occurred on that day.

As stated above, we do not make findings about credibility. Notwithstanding the juvenile court's clear ruling on Samantha's credibility ("The court found Samantha to be credible in court, . . . and she was largely consistent on the material points that matter. . . . [¶] . . . And observing her testimony and her demeanor, the court found Samantha credible."). Jose argues that we should disbelieve Samantha and believe him and Maria instead. Put another way, we should disregard what the juvenile court said about Samantha's credibility and rule instead that she was not credible. We simply do not have that power.

As for the physician's opinion, to which the court gave "substantial weight," a reexamination of the photos caused him to revise it to state the bruises appeared fresher than they would have been if they had been inflicted on the Tuesday before the Friday when Samantha reported them. The physician did not "waver on the timeline," as Jose represents. He revised it after taking a second look. Jose is, in effect, still arguing Samantha was injured, or injured herself, at Claudia's home and waited several days to report the injuries in order to blame Maria.

Substantial evidence supports the juvenile court's exercise of jurisdiction over Samantha, and we cannot make contrary findings about credibility.

## II.          Disposition

Section 361, subdivision (c)(1), precludes removal of child from a parent's physical custody unless the court finds by clear and convincing evidence that "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody."

The juvenile court found that, given Jose's persistent denials that Samantha had been harmed at his house, and given Maria's continued presence in the home, there was a substantial danger to Samantha's physical health, safety, and emotional well-being in Jose's custody and that she could not be protected by any means short of removal. This finding necessarily rests on the juvenile court's believing Samantha's version of events and disbelieving Maria's. To some extent, it also rests on the court's disbelieving Jose as well. The court also took into account the fact that Samantha did not tell her father what had happened because she feared retaliation from Maria. This fear would naturally be heightened if Jose retained custody, given that Samantha is "certainly now aware of . . . what her telling her teacher about this incident has led to."

8

Samantha's consistent testimony from the first day provides the clear and convincing evidence to support removal. The court was justified in finding it more credible than Jose's theory that Samantha deliberately injured herself, with or without Claudia's connivance, in order to disoblige Maria.[6] That, coupled with the evidence of the child abuse physician, who opined the bruises were consistent with defensive injuries and not consistent with accidental or play injuries, gave the court the necessary evidence to conclude removal from Jose's custody was the only reasonable way to keep Samantha safe from further abuse. As the court reasoned, if Jose did not believe the abuse happened, he would take no steps to ensure it did not happen again.

In his reply brief, Jose asserted that he had, since the case began, "stated that he would abide by any juvenile court order preventing Maria from caring for Samantha." The record does not reflect any such statement or any such sentiment. The pages of the clerk's transcript cited to support this assertion refer to the record of visitation and to Jose's insistence that Samantha had to visit him, like it or not. Nowhere in these pages does he state he would abide by an order preventing Maria from caring for Samantha, and, indeed, since he and Maria live together, it is difficult to see how he could arrange this.

In finding for removal of custody, the court also focused on Samantha's emotional well-being, particularly on her fear of reporting abuse to Jose. The evidence in the record supports this aspect of the order as well. For most of the period between detention and jurisdiction, Jose was focused, not on Samantha but on his own feelings of resentment at being hard done by or disobeyed. He repeatedly told SSA that she had no right to decide whether to visit; his rights were paramount. When she expressed fear of having a video visit, he suggested that SSA basically kidnap Samantha from school and

---

[6] On the one hand, Jose testified that Samantha and Maria had a close and affectionate relationship. On the other hand, he testified that Samantha conspired with Claudia, at considerable inconvenience to herself, to blame Maria for child abuse.

take her to a forced in-person visit. He exhibited no empathy for her, instead publicly branding her as a liar and refusing to believe her while championing Maria. The court's decision Samantha should not be living in such an atmosphere is not one we can disturb.

Substantial, clear and convincing evidence supported the juvenile court's decision to remove custody from Jose.

## DISPOSITION

The jurisdiction and disposition orders are affirmed.


BEDSWORTH, J.

WE CONCUR:


O'LEARY, P. J.


GOETHALS, J.